**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| JOSE GARCIA, derivatively on behalf of MAPLEBEAR INC. d/b/a INSTACART, <br><br> Plaintiff, <br><br> vs. <br><br> NICK GIOVANNI, RAVI GUPTA, JEFFREY JORDAN, MEREDITH KOPIT LEVIEN, BARRY MCCARTHY, APOORVA MEHTA, MICHAEL MORITZ, ALAN RAMSAY, LILY SARAFAN, FIDJI SIMO, FRANK SLOOTMAN, and DANIEL SUNDHEIM, <br><br> Defendants, <br><br> and <br><br> MAPLEBEAR INC. d/b/a INSTACART, <br><br> Nominal Defendant | Case No.: |

## <u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>

### <u>INTRODUCTION</u>

Plaintiff Jose Garcia ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Maplebear Inc., d/b/a Instacart ("Instacart" or the "Company"), files this Verified Shareholder Derivative Complaint against defendants Fidji Simo ("Simo"), Nick Giovanni ("Giovanni"), Alan Ramsay ("Ramsay"), Apoorva Mehta ("Mehta"), Jeffrey Jordan ("Jordan"), Meredith Kopit Levien ("Levien"), Barry McCarthy ("McCarthy"), Michael Moritz ("Moritz"), Lily Sarafan ("Sarafan"), Frank Slootman ("Slootman"), Daniel Sundheim ("Sundheim"), and Ravi Gupta ("Gupta") (collectively, the "Individual Defendants" and together with Instacart, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Instacart, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets,

and for contribution under Section 11(f) of the Securities Act of 1933 (the "Securities Act") and 21D of the Securities Exchange Act of 1934 (the "Exchange Act") against Defendants Simo, Giovanni, Ramsay, Mehta, Jordan, Levien, McCarthy, Moritz, Sarafan, Slootman, and Sundheim (collectively, the "Class Action Defendants"). As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Instacart, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Instacart's current and/or former directors and officers from September 19, 2023 to October 1, 2023, both dates inclusive (the "Relevant Period").

2.      Instacart purports to operate as a technology company that "power[s] the future of grocery through technology." Instacart created a model for grocery shopping that offers customers on-demand delivery from various retailers.

3.      The Company was originally created to help households manage their weekly grocery shopping. Today, Instacart's customers can place orders for delivery or pickup across a variety of use cases, including "the weekly shop, bulk stock-up, convenience, and special occasions."

4.      Instacart filed a registration statement on Form S-1 with the SEC in connection with its initial public offering ("IPO") on August 25, 2023. The registration statement was then declared effective by the SEC on September 18, 2023 (the "Registration Statement").

5.      Pursuant to the Registration Statement, on September 19, 2023, Instacart's common stock began publicly trading on the Nasdaq Global Select Market ("NASDAQ"). Instacart uses the ticker symbol "CART".

6.      The Company filed a prospectus on Form 424B4 with the SEC in connection with the IPO on September 20, 2023. The prospectus incorporated and formed part of the Registration Statement (the "Prospectus" and, collectively with the Registration Statement, the "Offering Documents").

7.      Pursuant to the Offering Documents, the Company, along with other selling stockholders identified in the Prospectus, sold 14.1 million and 7.9 million shares of Instacart common stock to the public, respectively, at an offering price of $30.00 per share. According to the Offering Documents, the total proceeds amounted to approximately $400 million and $224 million to Instacart and the selling stockholders, respectively, after applicable underwriting discounts and commissions.

8.      The truth began to emerge on September 22, 2023 when *Reuters* published an article reporting that Instacart's stock price was declining after "lukewarm analyst reports" indicated that Instacart was likely to struggle from fierce competition. In particular, the article discussed that "BTIG analyst Jake Fuller gave Instacart a 'neutral' rating and warned that the company faces heavy competition from DoorDash (DASH.N) and Uber Technologies (UBER.N) in the slowly expanding market of grocery delivery."

9.      On this news, the Company's stock price fell $0.65 per share, from a closing price of $30.65 on September 21, 2023 to close at $30.00 per share on September 22, 2023, amounting to a 2.12% decline.

10.      Less than two weeks later, on October 2, 2023, the truth fully emerged when investment research firm Gordon Haskett initiated coverage of Instacart with a "hold" rating, noting decreased consumer spending and competition as challenges for Instacart's business. The firm noted that it "ha[d] doubts that online grocery delivery adoption will continue to materially increase at a time when consumers are becoming increasingly cautious about spending[.]"

11.      On this news, Instacart's stock price fell $2.73 per share, or 9.2%, from a closing price of $29.69 on September 29, 2023 to close at $26.96 per share on October 2, 2023.

12.      During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (i) the Company exaggerated the speed at which online grocery shopping and delivery habits among consumers were accelerating; (ii) the Company downplayed the extent of the competition Instacart faced in the online grocery shopping and delivery market; (iii) due to the foregoing, the Defendants overstated Instacart's post-IPO growth, business, and financial prospects; and (iv) as a result, Instacart's public statements were materially false and misleading at all relevant times.

13.      Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

14.     In light of the Individual Defendants' misconduct—which has subjected the Company and numerous of the Individual Defendants to a federal securities fraud class action lawsuit pending in the United States District Court for the Northern District of California (the "Securities Class Action") and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollar

15.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

16.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of various of the directors' liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 11(f) of the Securities Act (15 U.S.C. § 77k(f)(1)) and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)).

18.     Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

19.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

20.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

21.     Venue is proper in this District because Instacart is incorporated in this District. In addition, a substantial portion of the transactions and wrongs complained of herein occurred in this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff Garcia

22.     Plaintiff Garcia is a current shareholder of Instacart. Plaintiff Garcia has continuously held Instacart common stock at all relevant times.

### Nominal Defendant Instacart

23.     Nominal Defendant Instacart is a Delaware corporation that is headquartered at 50 Beale Street, Suite 600, San Francisco, CA, 94105. Instacart stock trades on NASDAQ under the ticker symbol "CART."

### Defendant Simo

24.     Defendant Simo serves as the Company's Chief Executive Officer ("CEO") and Chairman of the Board. Defendant Simo has served as the Company's CEO since August 2021, as a Company director since January 2021, and as Chairman of the Board since August 2023.

25.     For the fiscal year ending on December 31, 2022 ("Fiscal Year 2022"), Defendant Simo received $1,512,565 in total compensation from the Company, which consisted of $500,000 in salary, $1,000,000 in bonus, and $12,565 in all other compensation.

26.     Instacart's Prospectus stated the following about Defendant Simo:

Fidji Simo. Ms. Simo has served as our President since December 2021, our Chief Executive Officer since August 2021, and a member of our board of directors since January 2021. From January 2011 to August 2021, Ms. Simo served in various roles at Meta Platforms, Inc. (formerly Facebook, Inc.), a social networking company, including as Head of the Facebook App since March 2019, where she led a team of 6,000 people and was responsible for the development of Facebook, the flagship product of Meta. From January 2007 to January 2011, Ms. Simo served as Strategy Manager at eBay, Inc., an eCommerce company. Ms. Simo currently serves on the board of directors of Shopify Inc., an eCommerce platform. Ms. Simo holds a Masters of Management from HEC Paris and spent the last year of her Masters program at the University of California, Los Angeles Anderson School of Management. Ms. Simo was selected to serve on our board of directors because of her deep product expertise as a senior executive at a major technology company. In connection with Mr. Mehta's resignation from our board of directors, including as Chairperson, immediately prior to the effectiveness of the registration statement of which this prospectus forms a part, Ms. Simo was appointed Chairperson of our board of directors.

### Defendant Giovanni

27.     Defendant Giovanni serves as Chief Financial Officer ("CFO") and Treasurer of Instacart and has served in these roles since January 2021.

28.     For Fiscal Year 2022, Defendant Giovanni received $812,565 in total compensation from the Company, which consisted of $500,000 in salary, $300,000 in bonus, and $12,565 in all other compensation.

29.     Instacart's Prospectus stated the following about Defendant Giovanni:

Nick Giovanni. Mr. Giovanni has served as our Chief Financial Officer and Treasurer since January 2021. From August 1998 to January 2021, Mr. Giovanni served in a number of roles at The Goldman Sachs Group, Inc., a multinational investment bank and financial services company, most recently as Global Head of the Technology, Media and Telecom Group in the Investment Banking Division, where he was responsible for group management and oversight of technology investment banking transactions. Mr. Giovanni holds a B.S. in Business Administration from the University of California, Berkeley.

### Defendant Ramsay

30.     Defendant Ramsay serves as the Chief Accounting Officer ("CAO") of Instacart. Defendant Ramsay has served as CAO since October 2019.

**Defendant Mehta**

31.      Defendant Mehta co-founded the Company and previously served as Chairperson of Instacart from August 2012 to September 2023. Defendant Mehta also served as the Company's CEO from August 2012 to August 2021.

32.      For the Fiscal Year 2022, Defendant Mehta received $4,672,114 in total compensation from the Company, consisting entirely of option awards.

33.      Instacart's Prospectus stated the following about Defendant Mehta:

Apoorva Mehta. Mr. Mehta has served as Chairperson of our board of directors since August 2012. Mr. Mehta is our co-founder and served at Instacart from August 2012 to February 2023, including as our Chief Executive Officer from August 2012 to August 2021. Since October 2022, Mr. Mehta has served as founder and Chief Executive Officer of Cloud Health Systems, LLC, a digital healthcare startup. From 2008 to 2010, Mr. Mehta served as a supply chain engineer for Amazon.com, Inc., a multinational technology company. Mr. Mehta holds a B.S. in Electrical Engineering from the University of Waterloo. Mr. Mehta was selected to serve on our board of directors because of the perspective and experience he provides as our co-founder and former Chief Executive Officer, as well as his extensive experience with technology companies. Mr. Mehta resigned from our board of directors, including as Chairperson, immediately prior to the effectiveness of the registration statement of which this prospectus forms a part.

**Defendant Jordan**

34.      Defendant Jordan has served as a Company director since June 2014.

35.      Instacart's Prospectus stated the following about Defendant Jordan:

Jeffrey Jordan. Mr. Jordan has served as a member of our board of directors since June 2014. Since July 2011, Mr. Jordan has served as a general partner of Andreessen Horowitz, a venture capital firm. From 2007 to 2011, Mr. Jordan served as the President and Chief Executive Officer of OpenTable, Inc., an online restaurant-reservation service company. From 2004 to 2006, Mr. Jordan served as President of PayPal Holdings, Inc., a digital payments company, which was then owned by eBay Inc., a multinational eCommerce company. From 1999 to 2004, Mr. Jordan served as Senior Vice President and General Manager of eBay North America. From 1998 to 1999, Mr. Jordan served as Chief Financial Officer of Hollywood Entertainment Corporation, a video rental company, and then President of its subsidiary, Reel.com. Previously, Mr. Jordan served in various capacities at The Walt Disney Company, a multinational mass media and entertainment company, most recently as Senior Vice President and Chief Financial Officer of the Disney Store Worldwide. Prior to that, Mr. Jordan worked for The Boston Consulting Group, a management consulting firm. Mr. Jordan currently serves on the boards of directors of Pinterest, Inc., a mobile app company, Airbnb, Inc., a home sharing company, Accolade, Inc., a health and wellness company, and a

number of private companies. Mr. Jordan holds a B.A. from Amherst College and an M.B.A. from the Stanford Graduate School of Business. Mr. Jordan was selected to serve on our board of directors because of his extensive experience in the venture capital industry and as an officer of technology companies.

**Defendant Levien**

36.     Defendant Levien has served as a Company director since October 2021. Defendant Levien also serves as a member of the Audit Committee and as Chair of the Compensation Committee.

37.     Instacart's Prospectus stated the following about Defendant Levien:

Meredith Kopit Levien. Ms. Kopit Levien has served as a member of our board of directors since October 2021. Since 2020, Ms. Kopit Levien has served as President and Chief Executive Officer of The New York Times Company, a media company, for which she previously served as Executive Vice President and Chief Operating Officer from 2017 to 2020, Executive Vice President and Chief Revenue Officer from 2015 to 2017, and Executive Vice President, Advertising from 2013 to 2015. Ms. Kopit Levien currently serves on the board of directors of The New York Times Company. Ms. Kopit Levien holds a B.A. from the University of Virginia. Ms. Kopit Levien was selected to serve on our board of directors because of her extensive experience in the media and advertising industries.

**Defendant McCarthy**

38.     Defendant McCarthy has served as a Company director since January 2021. Defendant McCarthy also serves as Chair of the Audit Committee.

39.     Instacart's Prospectus stated the following about Defendant McCarthy:

Barry McCarthy. Mr. McCarthy has served as a member of our board of directors since January 2021. Since February 2022, Mr. McCarthy has served as the Chief Executive Officer and President of Peloton Interactive, Inc., a fitness technology company. From 2011 to January 2022, Mr. McCarthy served as an Executive Advisor to Technology Crossover Ventures, a venture capital firm. Mr. McCarthy currently serves on the boards of directors of Peloton Interactive, Inc. and Spotify Technology S.A., a music streaming company, for which he served as Chief Financial Officer from July 2015 to January 2020 and global head of the advertising business from September 2016 to January 2020. Mr. McCarthy previously served on the boards of directors of MSD Acquisition Corp., a special purpose acquisition company, Pandora Media Inc., a music streaming company, Eventbrite, Inc., an event management company, and Chegg, Inc., an education technology company. From 1999 to 2010, Mr. McCarthy served as Chief Financial Officer and Principal Accounting Officer of Netflix, Inc., a video streaming company. Mr. McCarthy holds a B.A. in History from Williams College and an M.B.A. in Finance from the Wharton School at the University of Pennsylvania. Mr. McCarthy was selected to serve on our board of directors because of his experience as a chief financial officer,

his knowledge of technology companies, and his service on the boards of directors of various private and public companies.

**Defendant Moritz**

40.     Defendant Moritz has served as a Company director since June 2013. Defendant

Moritz also serves as a member of the Audit Committee and as Chair of the Nominating and

Corporate Governance Committee.

41.     Instacart's Prospectus stated the following about Defendant Moritz:

Michael Moritz. Mr. Moritz has served as a member of our board of directors since June 2013. Mr. Moritz currently serves as Senior Advisor to Sequoia Heritage, a private investment partnership, and from 1986 to July 2023, Mr. Moritz served as a Managing Member of Sequoia Capital, a venture capital firm. Mr. Moritz currently serves on the boards of directors of PhenomeX, Inc. (formerly Berkeley Lights, Inc.), a biotherapeutics company, and a number of private companies, including Klarna Inc., a financial technology company, and TrialSpark, Inc., a pharmaceutical company. Mr. Moritz previously served on the boards of directors of, among others, LinkedIn Corporation, a professional networking company, Green Dot Corporation, a financial technology company, PayPal Holdings, Inc., a digital payments company, Google, a multinational technology company, and Yahoo!, Inc., a web services provider and digital media company. Mr. Moritz holds an M.A. in History from Christ Church, Oxford. Mr. Moritz was selected to serve on our board of directors because of his extensive experience in the investment industry, his knowledge of technology companies, and his service on the boards of directors of various private and public companies.

**Defendant Sarafan**

42.     Defendant Sarafan has served as a Company director since October 2021.

Defendant Sarafan also serves as a member of the Compensation Committee and the Nominating

and Corporate Governance Committee.

43.     Instacart's Prospectus stated the following about Defendant Sarafan:

Lily Sarafan. Ms. Sarafan has served as a member of our board of directors since October 2021 and as our lead independent director since October 2022. Since December 2020, Ms. Sarafan has served as Executive Chair of TheKey LLC, a premium provider of in-home care, for which she previously served as Chief Executive Officer since she co-founded the company in 2005 until December 2020. Ms. Sarafan holds a B.S. in Science, Technology, and Society from Stanford University and an M.S. in Management Science and Engineering from Stanford University. Ms. Sarafan was selected to serve on our board of directors because of her extensive experience as a founder and executive.

## Defendant Slootman

44.     Defendant Slootman has served as a Company director since January 2021.

45.     Instacart's Prospectus stated the following about Defendant Slootman:

Frank Slootman. Mr. Slootman has served as a member of our board of directors since January 2021. Since April 2019, Mr. Slootman has served as the Chief Executive Officer and Chairman of the board of directors of Snowflake Inc., a cloud-based data warehousing company. From October 2016 to June 2018, Mr. Slootman served as Chairman of the board of directors of ServiceNow, Inc., an enterprise IT cloud company. From May 2011 to April 2017, Mr. Slootman served as President and Chief Executive Officer and as a member of the board of directors of ServiceNow, Inc. From January 2011 to April 2011, Mr. Slootman served as a Partner of Greylock Partners, a venture capital firm. From July 2009 to January 2011, Mr. Slootman served as President of the Backup Recovery Systems Division at EMC Corporation, a computer data storage company, and then as an advisor from January 2011 to February 2012. From June 2003 until its acquisition by EMC Corporation in July 2009, Mr. Slootman served as President and Chief Executive Officer of Data Domain Corporation, an electronic storage solution company. Mr. Slootman previously served as a member of the board of directors of Pure Storage, Inc., from May 2014 to February 2020, and Imperva, Inc., from August 2011 to March 2016. Mr. Slootman holds undergraduate and graduate degrees in Economics from the Netherlands School of Economics, Erasmus University Rotterdam. Mr. Slootman was selected to serve on our board of directors because of his experience as an executive and board member at several private and public high-growth technology companies.

## Defendant Sundheim

46.     Defendant Sundheim has served as a Company director since June 2020. Defendant

Sundheim also serves as a member of the Compensation Committee.

47.     Instacart's Prospectus stated the following about Defendant Sundheim:

Daniel Sundheim. Mr. Sundheim has served as a member of our board of directors since June 2020. Since July 2017, Mr. Sundheim has served as the Founder and Chief Investment Officer of D1 Capital Partners L.P., an investment management firm. From August 2002 to June 2017, Mr. Sundheim served in various capacities at Viking Global Investors, an investment management firm, including as an analyst from 2002 to 2005, a portfolio manager from 2005 to 2010, as Co-Chief Investment Officer from 2010 to 2014, and as Chief Investment Officer from 2014 to 2017. Mr. Sundheim holds a B.S. in Economics from the Wharton School of the University of Pennsylvania. Mr. Sundheim was selected to serve on our board of directors because of his extensive financial and business expertise.

**Defendant Gupta**

48.     Defendant Gupta has served as a Company director since the day after the IPO closed. He also serves as a member of the Compensation Committee and Nominating and Corporate Governance Committee.

49.     Instacart's Prospectus stated the following about Defendant Gupta:

> Ravi Gupta. Mr. Gupta has been appointed to serve as a member of our board of directors, effective one business day following the closing of this offering. Since November 2019, Mr. Gupta has served as a Managing Member of Sequoia Capital, a venture capital firm. From 2015 to November 2019, Mr. Gupta served as our Chief Financial Officer, and from December 2016 to November 2019, Mr. Gupta also served as our Chief Operating Officer. From 2005 to 2015, Mr. Gupta served in a number of roles at Kohlberg Kravis Roberts & Co. L.P, a global investment firm, most recently as a director. Mr. Gupta holds a B.S. in Economics from Duke University. Mr. Gupta was selected to serve on our board of directors because of his extensive financial and business expertise and his experience as an executive or director at high-growth technology companies.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

50.     By reason of their positions as officers and/or directors of Instacart and because of their ability to control the business and corporate affairs of Instacart, the Individual Defendants owed Instacart and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were/are required to use their utmost ability to control and manage Instacart in a fair, just, honest, and equitable manner. The Individual Defendants were/are required to act in furtherance of the best interests of Instacart and its shareholders to benefit all shareholders equally.

51.     Each director and officer of the Company owes to Instacart and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

52.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Instacart, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

53.     To discharge their duties, the officers and directors of Instacart were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

54.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Instacart, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Instacart's Board at all relevant times.

55.     As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock

would be based upon truthful and accurate information. Further, they had a duty to ensure that the Company remained in compliance with all applicable laws.

56.     To discharge their duties, the officers and directors of Instacart were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Instacart were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, and the United States, and pursuant to Instacart's own Code of Business Conduct and Ethics (the "Code of Conduct");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Instacart conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Instacart and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Instacart's operations would comply with all

applicable laws and Instacart's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

57.    Each of the Individual Defendants further owed to Instacart and the shareholders the duty of loyalty. The duty of loyalty requires that the Individual Defendants act in favor of Instacart's and Instacart's shareholders' interest over their own while conducting the affairs of the Company, and refrain from using their position, influence, or knowledge of Instacart's affairs to gain personal advantage.

58.    At all times relevant hereto, the Individual Defendants were the agents of each other and Instacart and were at all times acting within the course and scope of such agency.

59.    Because of their advisory, executive, managerial, and directorial positions with Instacart, each of the Individual Defendants had access to adverse, non-public information about the Company.

60.     The Individual Defendants, because of their positions of control and authority, were able to, and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Instacart.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

61.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

62.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, and abuse of control; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

63.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Instacart was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

64.    Each of the Individual Defendants aided, abetted, and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

65.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Instacart and was at all times acting within the course and scope of such agency.

## INSTACART'S CODE OF CONDUCT

66.    The Company's Code of Conduct represents that it applies to "all employees, officers and directors of Instacart and its subsidiaries, provided that employees of any subsidiary that has adopted its own code of business conduct and ethics must instead comply with such subsidiary's code. Similarly, [Instacart] expect[s] [its] contractors, consultants, vendors, partners and suppliers to adhere to the principles in this Code."

67.    The Code of Conduct starts by providing under the heading "Purpose" that:

At Instacart, one of our core values is to "Grow the Pie" for each of our key constituents: retailers, customers, brands, and shoppers. We believe the success of our business relies on the success of each of these groups - when they win, we win.

In pursuing success for ourselves and our constituents, we strive to achieve the highest business and personal ethical standards as well as compliance with the laws and regulations that apply to our business. This Code of Business Conduct and Ethics (this "Code") of Maplebear Inc. (dba Instacart) (the "Company," "Instacart," "we," "us," or "our") summarizes the business practices and regulatory requirements that guide our decision-making and business activities. The purpose of this Code is to promote:
- A culture of integrity, accountability and respect for others;
- Honest and ethical conduct, including the handling of real or seeming conflicts of interest;

- Compliance with applicable laws, rules and regulations, including full, fair, accurate, timely and understandable
- disclosure in reports and documents we file with or submit to the Securities and Exchange Commission and in our other public communications;
- Fair and accurate financial reporting;
- Protection of Instacart's legitimate business interests, assets and confidential information; and
- Prompt internal reporting of violations of this Code without fear of retaliation.

68.     The Code of Conduct provides, as to the "Compliance with Laws, Rules and Regulations," that:

> Our success depends upon each person operating within ethical and legal guidelines. We expect you to understand the legal and regulatory requirements applicable to your area of responsibility, including federal, state and foreign laws, and to use good judgment and common sense in seeking to comply with all applicable laws, rules and regulations. A few important areas of legal compliance are discussed below. If you have questions about any laws or regulations, reach out to the Legal Team for advice.
>
> We take violations of the law seriously since such violations may put Instacart and employees at risk. Any violation may subject you to disciplinary action, which may include termination. Those who work with us, such as contractors (including shoppers), consultants, agents, volunteers, representatives, partners and suppliers, are also expected to follow these standards. Certain violations may be referred to legal authorities for investigation and civil or criminal prosecution. If you become aware of any violations of any law, rule or regulation by Instacart, whether by its officers, employees or directors, or any third party doing business on our behalf, it is your responsibility to promptly report the matter. See "Duty to Report Violations" below for information on how to report violations.

69.     The Code of Conduct provides, as to "Accurate Financial and Accounting and Other Disclosures," that:

> Employees, contractors and consultants are responsible for the accurate and complete reporting of financial information within their respective areas of responsibility and for the timely notification to senior management of financial and nonfinancial information that may be material to the Company. We expect our employees, contractors and consultants to take this responsibility very seriously to ensure full, fair, accurate, timely and understandable disclosure in reports and documents that we file with government agencies or releases to the general public.

Anyone involved in our disclosure process must familiarize themselves with the disclosure requirements applicable to us as well as our business and financial operations, and must not knowingly misrepresent, or cause others to misrepresent, facts about Instacart to others, whether within or outside the Company, including to our independent auditors, governmental regulators and self-regulatory organizations.

Our books, records, accounts and financial statements must be maintained in reasonable detail, and reflect the matters to which they relate accurately, fairly and completely, and must conform both to applicable legal requirements and to our system of internal controls. All Instacart assets must be carefully and properly accounted for. We strictly prohibit any undisclosed or unrecorded payments, assets, funds or accounts for any purpose. No false or misleading entries, including misclassifying transactions as to accounts, business units or accounting periods, shall be made in our books or records for any reason, and no disbursement of corporate funds or other corporate property shall be made without adequate supporting documentation and authorization in accordance with our Signature Authority Policy. Every employee, contractor and consultant has an obligation to make sure that the information we record meets these standards. If you believe any questionable accounting or auditing conduct has occurred, you must report your concerns via the channels specified in our Whistleblower Policy.

70.     The Code of Conduct provides, as to "Insider Trading," that:

You may not trade, or tip others to trade, in our securities or the securities of another company while in possession of material non-public information about that company. "Material" information is information that an average investor would find important in making a decision to buy or sell a company's securities. "Non-public" means any information not yet shared publicly and adequately absorbed by the public. Buying or selling securities while in possession of material, non-public information, or tipping others to trade based on this information, is a violation of insider trading laws as well as this Code and our Insider Trading Policy.

71.     Under the heading "Honest and Ethical Conduct," the Code of Conduct provides:

While we constantly strive to provide value for our constituents, we are committed to doing so with integrity. Employees must not compromise our ethical standards when conducting Instacart business or for personal benefit.

Ethical Business Practices
You should always deal honestly, ethically and fairly with our partners, suppliers, customers and competitors. Statements regarding our products and services must not be untrue, misleading, deceptive or fraudulent. You must not take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts or any other unfair-dealing

practice. You also must never create or submit false, inaccurate, or misleading invoices, receipts, or other financial or business-related documents.

<u>Conflicts of Interest</u>
Employees, officers and directors must act in the best interests of Instacart. Accordingly, you must refrain from engaging in any activity or having a personal interest that presents or creates the appearance of a "conflict of interest." A conflict of interest occurs when your personal interest interferes, or appears to interfere, with the interests of Instacart, including when an employee, officer, or director, or a member of his or her family, receives improper personal benefits as a result of his or her position at Instacart. A conflict of interest can also arise whenever you take action or have an interest that prevents you from performing your duties and responsibilities honestly, objectively and effectively[.]

\*               \*               \*

Additionally, we are required to abide by the securities laws that govern conflicts of interest by our executive officers and directors. The actions or relationships that will be considered conflicts with respect to our executive officers and directors are only those that meet the requirement for disclosure in our periodic filings with the SEC pursuant to Item 404 of Regulation SK, referred to as related person transactions. Such related person transactions must be approved or ratified, as applicable, by the Audit Committee or the Board of Directors as required by applicable laws and regulations and consistent with our policies. In the event such transaction is properly approved or ratified, it shall not be deemed a waiver of this Code.

72.     The Code of Conduct provides, as to "Protection of Instacart Assets and Interests,"

specifically under the headings "Corporate Opportunities and "Confidentiality," that:

<u>Corporate Opportunities</u>
You may not take personal advantage of opportunities for Instacart that are presented to you or discovered by you as a result of your position with us or through your use of corporate property or information. Even opportunities that are acquired privately by you may be questionable if they are related to our existing or proposed lines of business. For example, significant participation in an investment or outside business opportunity that is directly related to our lines of business may create a conflict of interest. You may not use your position with us or corporate property or information for improper personal gain, nor should you compete with us in any way. Employees, officers and directors must advance Instacart's legitimate interests when the opportunity to do so arises.

<u>Confidentiality</u>
You must safeguard any confidential information entrusted to you by Instacart or other parties, including our partners, suppliers and customers, except when

disclosure has been properly authorized or legally mandated. Confidential information includes all non-public information related to Instacart's business. Unauthorized disclosure of any confidential information is prohibited. Additionally, you must take appropriate precautions to ensure that confidential or sensitive business information is communicated within Instacart only to those employees who have a need to know such information to perform their work responsibilities, whether it is proprietary to us or another party for whom we have agreed to maintain confidentiality, such as a retail partner. All work emails, voicemails and other communications are presumed confidential and should not be forwarded or otherwise disseminated to outside individuals, except where required for Instacart-related business reasons. Similarly, all customer, partner and supplier information is confidential information and might also include personally identifiable information which you are legally required to protect and keep confidential. Your obligation to treat certain information as confidential does not end when you leave Instacart, and you may not subsequently disclose any confidential information to a new employer or to others. For more information, please review our Confidentiality Guidelines and your Proprietary Information and Inventions Agreement[.]

73.     The Code of Conduct provides, as to the "Duty to Report Violations," that:

Nothing in this Code should discourage you from reporting any illegal activity, including any violation of the securities laws, antitrust laws or any other federal, state or foreign law, rule or regulation, to the appropriate regulatory authority. This Code does not prohibit you from testifying, participating or otherwise assisting in any state or federal administrative, judicial or legislative proceeding or investigation. In addition, notwithstanding any other confidentiality or nondisclosure agreement (including as part of an employment agreement, separation agreement or similar employment or compensation arrangement) applicable to you, we do not restrict any current or former employee from communicating, cooperating or filing a complaint with, or otherwise making disclosures to, any governmental or law enforcement branch, agency or entity with respect to possible violations of any law or regulation, in each case, that are protected under the whistleblower provisions of any such law or regulation. Any agreement in conflict with the foregoing is hereby deemed amended by us to be consistent with the foregoing.

74.     In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, and unjust enrichment. Also in violation of the Code of

Conduct, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

## INSTACART'S AUDIT COMMITTEE CHARTER

75.     The Company's Amended and Restated Audit Committee Charter (the "Charter") states that the purpose of the Audit Committee "is to assist the Board in fulfilling its oversight responsibilities[.]" Specifically, the Audit Committee has responsibilities regarding:

- the Company's accounting and financial reporting processes, systems of internal control over financial reporting and audits of financial statements, as well as the quality and integrity of the Company's financial statements and reports;
- the qualifications, independence and performance of the registered public accounting firm or firms engaged as the Company's independent outside auditors for the purpose of preparing or issuing an audit report or performing other audit, review or attest services (the "Auditors");
- the performance of the Company's internal audit function, if applicable;
- the Company's programs and policies with respect to risk assessment and risk management; and
- the Company's compliance with legal and regulatory requirements, including compliance with ethical standards adopted by the Company.

In furtherance of its purpose, the Committee will endeavor to maintain and foster an open avenue of communication among the Committee and the Auditors, the Company's financial management and internal auditors, if applicable.

76.     The Audit Committee Charter outlines the primary responsibilities of the Audit Committee, stating that:

The following are the principal responsibilities of the Committee. The Committee may perform such other functions as are consistent with its purpose and applicable law, rules and regulations. The Committee may also carry out any other responsibilities delegated to it by the Board from time to time.

1. **Oversight**. The Committee shall oversee the Company's financial reporting process on behalf of the Board, shall have direct responsibility for the appointment, compensation, retention and oversight of the work of the Auditors. The Auditors shall report directly and be accountable to the Committee.

2. **Evaluation and Retention of Auditors**. The Committee will evaluate the performance of the Auditors, assess their independence and qualifications, including the performance and qualifications of the lead partner, as appropriate, taking into account the opinions of management and the internal auditors (or other personnel responsible for the internal audit function), and determine whether to retain or terminate the engagement of the existing Auditors or appoint and engage a different independent registered public accounting firm. The Committee will recommend the selection of the Auditor for ratification by the stockholders, if appropriate in the Committee's discretion.

3. **Communication Prior to Engagement.** Prior to engagement of any prospective Auditors, the Committee will review a written disclosure by the prospective Auditors of all relationships between the prospective Auditors, or their affiliates, and the Company, or persons in financial oversight roles at the Company, that may reasonably be thought to bear on independence, and will discuss with the prospective Auditors the potential effects of such relationships on the independence of the prospective Auditors, consistent with Ethics and Independence Rule 3526, Communication with Audit Committees Concerning Independence ("Rule 3526"), of the Public Company Accounting Oversight Board (United States) (the "PCAOB").

4. **Approval of Audit Engagements**. The Committee will determine and approve engagements of the Auditors, prior to commencement of such engagements, to perform all proposed audit, review and attest services, including the scope of and plans for the audit, the adequacy of staffing, the compensation to be paid, at the Company's expense, to the Auditors and the negotiation on behalf of the Company, of the Auditors' engagement letters, which approval may be pursuant to preapproval policies and procedures established by the Committee consistent with applicable laws and rules, including the delegation of preapproval authority to one or more Committee members so long as any such preapproval decisions are presented to the full Committee at the next scheduled meeting.

\*     \*     \*

9. **Audited Financial Statement Review**. The Committee will review and discuss with management and the Auditors, upon completion of the audit, the financial statements proposed to be included in the Company's Annual Report on Form 10-K to be filed with the Securities and Exchange Commission, including the disclosures under the caption "Management's Discussion and Analysis of Financial Condition and Results of Operations." Following this review, the Committee will recommend whether or not such financial statements should be included in the Company's Annual Report on Form 10-K.

10. **Annual Audit Results Review**. The Committee will review with management and the Auditors, the results of the annual audit, the opinion of the Auditors on

the annual financial statements and the matters required to be communicated to the Committee by the Auditors under applicable standards adopted by the PCAOB. In addition, the Committee will review and discuss with the Auditors (a) all critical accounting policies and practices to be used in the annual audit, (b) all alternative treatments of financial information within U.S. generally accepted accounting principles ("GAAP") for material items that have been discussed with management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the Auditors and (c) other material written communications between the Auditors and management, such as any management letter or schedule of unadjusted differences.

11. **Quarterly Results Review**. The Committee will review and discuss with management and the Auditors, as appropriate, the quarterly financial statements, including the disclosures under the caption "Management's Discussion and Analysis of Financial Condition and Results of Operations," and the results of the Auditors' review of such financial statements, prior to public disclosure of quarterly financial information, if practicable, or filing with the Securities and Exchange Commission of the Company's Quarterly Report on Form 10-Q, and any other matters required to be communicated to the Committee by the Auditors under applicable PCAOB standards.

12. **Earnings Press Releases**. The Committee will discuss with management and the Auditors, as appropriate, earnings press releases as well as financial information and earnings guidance provided to analysts and rating agencies, including the use of "pro forma," or "adjusted" non-GAAP information, which discussions may be general discussions of the type of information to be disclosed and the type of presentation to be made.

13. **Accounting Principles and Policies**. The Committee will review with management and the Auditors, as appropriate, major issues that arise regarding accounting principles and financial statement presentation, including any significant changes in the Company's selection or application of accounting principles, significant regulatory or accounting initiatives or developments, as well as off-balance sheet structures, that may have a material impact on the Company's financial statements.

14. **Management and Auditor Analyses**. The Committee will review any analyses prepared by management or the Auditors setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements.

15. **National Office Communications**. The Committee will review with the Auditors, as appropriate, any communications between the audit team and the Auditors' national office with respect to auditing or accounting issues presented by the engagement.

16. **Disagreements Between Auditors and Management**. The Committee will review with management and the Auditors, any conflicts or disagreements between management and the Auditors, whether or not resolved, regarding financial reporting, accounting practices or policies or other matters, that individually or in the aggregate could be significant to the Company's financial statements or the Auditors' report, and management's response, if any, and will resolve any conflicts or disagreements regarding financial reporting.

17. **Management** Cooperation with Audit. The Committee will evaluate any audit problems or difficulties the Auditors encountered in the course of the audit work, including any restrictions on the scope of their activities or access to required records, data and information, and, whether or not resolved, any significant disagreements with management and management's response, if any.

18. **Management Letters**. The Committee will review with the Auditors any "management" or "internal control" letter issued, or to the extent practicable, proposed to be issued by, the Auditors and management's response, if any, to such letter, as well as any additional material written communications between the Auditors and management.

19. **Internal Control Over Financial Reporting**. The Committee will discuss and review with management, the Company's internal auditors, and the Auditors, as appropriate, the scope, adequacy and effectiveness of the Company's internal control over financial reporting and any special audit steps adopted in the event of material control deficiencies.

20. **Internal Audit Function**. The Committee will review and discuss with the Auditors the responsibilities, budget and staffing of the Company's internal audit function. The Committee will also review and approve the Company's Internal Audit Charter and any amendments. In addition, the Committee will review any significant reports prepared by the Company's internal auditors, as well as management's response. The Committee will review and participate in the selection or dismissal of the Company's head of internal audit.

\*          \*               \*

22. **Correspondence with Regulators**. The Committee will consider and review with management, the Auditors, outside counsel, as appropriate, and any special counsel, separate accounting firm or other consultants and advisors as the Committee deems appropriate, any correspondence with regulators or governmental agencies and any published reports that raise material issues regarding the Company's financial statements or accounting policies.

23. **Legal and Regulatory Compliance**. The Committee will review the results of management's efforts to monitor compliance with the Company's programs and policies designed to ensure adherence to applicable laws and regulations, as well as to its Code of Business Conduct and Ethics.

24. **Related Party Transactions**. The Committee will review and oversee all transactions between the Company and a related person for which review or oversight is required by applicable law or that are required to be disclosed in the Company's financial statements or SEC filings and develop and oversee policies and procedures for the Committee's review, approval and/or ratification of such transactions.

25. **Risk Assessment and Management**. The Committee will discuss with management and, as appropriate, the Auditors, the Company's guidelines and policies with respect to risk assessment and risk management, including the Company's major financial risk exposures and the steps taken by management to monitor and control these exposures.

26. **Attorneys' Reports**. The Committee will receive and, if appropriate, respond to attorneys' reports of evidence of material violations of securities laws and breaches of fiduciary duty and similar violations of U.S., state or other applicable law

\*          \*                \*

27. **Proxy Report**. The Committee will prepare the report required by the rules of the Securities and Exchange Commission to be included in the Company's annual proxy statement.

\*          \*                \*

It shall be the responsibility of management to prepare the Company's financial statements and periodic reports and the responsibility of the Auditors to audit those financial statements. These functions shall not be the responsibility of the Committee, nor shall it be the Committee's responsibility to ensure that the financial statements or periodic reports are complete and accurate, conform to GAAP or otherwise comply with applicable laws.

(Emphasis on original.)

77.    In violation of the Charter, the Audit Committee Defendants (defined below) failed to adequately review and discuss the Company's quarterly earnings press releases; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure

adequate Board oversight of the Company's internal controls over financial reporting, disclosure controls and procedures, and Code of Conduct.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

78.     Instacart is a technology corporation that purports to "power the future of grocery through technology." Instacart created a model for grocery shopping that offers customers on-demand delivery from various retailers. Instacart was originally created to help households manage their weekly grocery shopping. Today, Instacart's customers can place orders for delivery or pickup across a variety of use cases.

79.     Instacart filed the Registration Statement on Form S-1 with the SEC in connection with the IPO on August 25, 2023. The Registration Statement was amended several times and then declared effective by the SEC on September 18, 2023.

80.     Pursuant to the Registration Statement, on September 19, 2023, the Company's common stock began publicly trading on NASDAQ under the ticker symbol "CART".

81.     On September 20, 2023, the Company filed the Prospectus with the SEC on Form 424B4 in connection with the IPO. The Prospectus incorporated and formed part of the registration statement.

82.     The Company, along with other selling stockholders that had been identified in the Prospectus, sold 14.1 and 7.9 million shares of Instacart common stock to the public, respectively, at an offering price of $30.00 per share pursuant to the Offering Documents. The total proceeds amounted to approximately $400 million and $224 million to Instacart and the selling stockholders, respectively.

### Materially False and Misleading Statements

83.     The Offering Documents contained a letter written by Defendant Simo (the "IPO Letter"). The IPO Letter suggested to investors that online grocery orders and attendant deliveries were an expanding trend that the Company was uniquely positioned to capitalize on, stating the following, in relevant part:

> **As I write this, a massive digital transformation is underway in the grocery industry**. Grocery is the largest retail category and represents a $1.1 trillion industry in the United States alone. But only 12% of grocery sales are made online today.[] As even more people shop online, online penetration could double or more over time.[]
>
> This shift is being driven, in large part, by consumer expectations growing more diverse and complex. We might be able to wait a couple of hours for our weekly shop but need popcorn in 30 minutes for an impromptu family movie night. Sometimes we want to buy groceries on our phones and sometimes in the store. We want grocers to understand our tastes and preferences and offer us a seamless, personalized experience everywhere.
>
> *   *   *
>
> With the business of grocery changing so quickly, many retailers need a trusted partner to help them navigate this digital transformation so that they can drive success both online and in-store and serve their customers better – in all of the ways they choose to shop. It's especially important because their competitors – from established tech platforms to new startup disrupters – are trying to lure customers away from traditional grocers. If the neighborhood grocer who has been serving their community for decades can't fill an edge, they may not be able to keep up.
>
> That's where we come in.

(Emphasis in original.)

84.     The Offering Documents further discussed the alleged shift in consumer preferences to purchase groceries online and have them delivered. In discussing this shift, the Offering Documents stated, in relevant part:

> In 2022, only 12% of U.S. grocery shopping took place online… Over the past three years, this spend shifted from offline to online at an accelerated pace. Online grocery penetration took 10 years to triple from 1% of total grocery sales in 2009[] to 3% in 2019 and just three years to quadruple to 12% in 2022.[] Market penetration could double or more over time.[]

> For grocery retailers, this means that online success is critical, and all grocers from large national players to local mainstays must prepare for a future where all aspects of their business, including their stores, will be improved through technology… Grocery retail is characterized by diverse consumer behaviors, complex inventory management and fulfillment, lack of integrated omni-channel data, a shortage of technology that is custom-built for online grocery, a disaggregated supply chain, and a low operating margin. Before Instacart, grocery retailers did not have access to a unified technology solution to manage eCommerce, fulfillment, in-store, ads and marketing, and insights. Instacart is solving this problem.

85.     The Offering Documents further suggested that "[s]atisfied customers will continue to order on Instacart." Additionally, the Offering Documents stated that "[l]ower fees make ordering online more appealing for customers, resulting in a higher frequency of usage," and also that "[Instacart] will continue to help retail partners capture new customers as consumer behaviors and preferences shift."

86.     With regard to the Company's competition in the online grocery shopping and delivery market, the IPO Letter significantly downplayed the risks the Company was facing, representing that the Company "now deliver[s] the best consumer online grocery experience anywhere" and that retail partners, "by partnering with Instacart… can have the same technology edge as tech giants and startups[.]"

87.     Regarding Instacart's competition, the IPO Letter also stated the following, in relevant part:

> Today, Instacart partners with more than 1,400 national, regional, and local retail banners across more than 80,000 stores that represent more than 85% of the U.S. grocery industry.[] Millions of households depend on us and our partners for their grocery needs.[] We power tens of billions of dollars in annual sales for retailers,[] which makes Instacart the leading grocery technology company in North America.[] Our GTV [gross transaction value], representing the online sales we power for all our retail partners, grew at a compound annual growth rate of 80% between 2018 and 2022, compared to 50% for the overall online grocery market and 1% for offline grocery.[] We have demonstrated our ability to help our retail partners drive strong growth and stay competitive in a complex and increasingly digital industry.

88.     In discussing the Company's alleged "strengths" that differentiate the Company from competitors, the Offering Documents stated that, "more than 1,400 national, regional, and local retail banners[] that collectively represent more than 85% of the U.S. grocery industry partner with Instacart," which "[Instacart] believe[s]… represents the broadest selection of grocers on a marketplace in North America, providing customers with a superior online grocery shopping experience."

89.     The Offering Documents further explained that "[b]ecause we do not own inventory, we do not compete with our retail partners," which "[w]e believe… puts us in a unique position to foster greater trust between grocers and Instacart, making us the preferred technology partner"; that "[w]hen brands advertise with us, they can reach their target audience more efficiently and at greater scale than is possible through other online channels"; that the Company "help[s] retailers serve all use cases of grocery, unlike other players that tend to focus on serving a particular use case"; and that, "[b]ecause we serve this breadth of use cases, we are a better partner to retailers by helping them address consumer needs and drive engagement and a better partner to brands by creating more diverse and actionable advertising opportunities." The Offering Documents further elaborated that "[w]ith our unique customer data and insights, we provide differentiated analytics for brands."

90.     The Offering Documents also contained generic risk warnings that purportedly warned investors about the risks associated with Instacart's competition that could occur under various circumstances, stating the following, in relevant part:

> *The markets in which we participate are highly and increasingly competitive, with well-capitalized and better-known competitors, some of which are also partners. If we are unable to compete effectively, our business and financial prospects would be adversely impacted.*

\* \* \*

[W]hile we work to expand further in the United States and Canada and potentially enter international markets, and introduce new offerings across a range of industries, *many of our competitors remain focused on a limited number of products or on a narrow geographic scope,* allowing them to develop specialized expertise and employ resources in a more targeted manner than we do. As we and our competitors introduce new offerings, and as existing offerings evolve, we expect to become subject to additional competition. *If* we are unable to offer comparable or superior offerings, our business *may* be adversely affected. In addition, our competitors *may* adopt certain of our features, or *may* adopt innovations that consumers value more highly than ours, which would render our offerings less attractive or reduce our ability to differentiate our offerings.

Many of our competitors are well-capitalized and are able to offer discounted or free services, shopper incentives, consumer discounts and promotions, innovative products and offerings, and alternative pricing models, which *may* be more attractive to customers, retailers, brands, or shoppers than those that we offer. In addition, we *may* not be able to effectively compete with service offerings from vertically integrated competitors, such as Amazon or Drizly, which control both the brick-and-mortar retailer and online fulfillment technology. Certain brick-and-mortar retailers that have their own digital offering, such as Walmart, also have significant size, scale, geographic, and shopper base advantages, which *may* allow them to grow online or GTV or capture increasing share of the online grocery market more effectively and at a faster rate than us. Competitors *may* also offer fulfillment options from our retail partners, despite having no formal engagement with such retailers. Further, some of our current or potential competitors have, and *may* in the future continue to have, greater resources and access to larger consumer and shopper bases in a particular geographic area. In addition, our competitors in certain geographies enjoy substantial competitive advantages, such as greater brand recognition, longer operating histories, larger marketing budgets, better localized knowledge, and/or fewer regulatory challenges. Smaller competitors *may* be more nimble at anticipating and meeting changing market dynamics. As a result, such competitors *may* be able to respond more quickly and effectively than us in such markets to new or changing opportunities, technologies, consumer preferences, regulations, or standards, which *may* render our offerings less attractive.

\* \* \*

For all of these reasons, we *may* not be able to compete successfully against our current and future competitors. Our inability to compete effectively would have an adverse effect on our ability to acquire new customers, retailers, and brand partners or increase the engagement of our existing customers, retailers, and brand partners, or would otherwise harm our business, financial condition, and results of operations.

(First emphasis in original; other emphases added.)

91.     These risk warnings were generic, catch-all provisions that were not narrowly tailored to the Company's known risks relating to its competition in the online grocery shopping and delivery market. These risks were also downplayed by the Offering Documents' suggestion in the same risk warnings that the Company's competitors focused only on a "narrow geographic scope" or a "limited number of products."

92.     On September 19, 2023, the day the Company's stock began publicly trading on the NASDAQ, the Company issued a press release entitled, "Stock Up Your CART! A Letter from Instacart CEO Fidji Simo," that contained the same statements as referenced in ¶83 and ¶¶86-87.

93.     The statements referenced in ¶¶83-90, and 92 were materially false and misleading because they failed to disclose, *inter alia*, that: (i) the Company exaggerated the speed at which online grocery shopping and delivery habits among consumers were accelerating; (ii) the Company downplayed the extent of the competition Instacart faced in the online grocery shopping and delivery market; (iii) due to the foregoing, the Defendants overstated Instacart's post-IPO growth, business, and financial prospects; and (iv) as a result, Instacart's public statements were materially false and misleading at all relevant times.

**The Truth Emerges**

94.     The truth began to emerge on September 22, 2023 when *Reuters* published an article during trading hours entitled "Arm and Instacart add to losses after lukewarm analyst reports." The report stated the following, in relevant part:

> Shares of… Instacart deepened their recent losses on Friday after analysts gave lukewarm ratings to [Instacart] that recently held [a] highly anticipated initial public offering[].
>                                         * * *
> Grocery delivery app Instacart (CART.O), formally known as Maplebear, fell 2.1% to $30.02, marginally above the $30 price set in its IPO on Monday.

* * *

In a client note, BTIG analyst Jake Fuller gave Instacart a "neutral" rating and warned that the company faces heavy competition from DoorDash (DASH.N) and Uber Technologies (UBER.N) in the slowly expanding market of grocery delivery.

95.     On this news, the Company's stock price fell $0.65 per share, from a closing price of $30.65 on September 21, 2023 to close at $30.00 per share on September 22, 2023, amounting to a 2.12% decline.

96.     Less than two weeks later, on October 2, 2023, the truth fully emerged when investment research firm Gordon Haskett initiated coverage of Instacart with a "hold" rating, noting decreased consumer spending and competition as challenges for Instacart's business. In an article published by *Bloomberg* entitled "Instacart Falls; Gordon Haskett Cites Headwinds for Hold Rating," the following was reported, in relevant part:

> Grocery-delivery giant Instacart falls as much as 7.9% Monday to its lowest level since going public after Gordon Haskett initiated coverage of the stock with a hold rating and $31 price target, citing headwinds ahead.
>
> The Firm sees limited multiple expansion opportunity as Instacart's margin projections—which are slightly better than peers—won't be enough to offset concerns in the industry[.]
>
> We "have doubts that online grocery delivery adoption will continue to materially increase at a time when consumers are becoming increasingly cautious about spending," analyst Robert Mollins wrote[.]
>
> Says competitive encroachment is also a concern for Instacart…
>
> Sees potential risk of Instacart+ members leaving for programs that offer "more services and better value[.]"
>
> Says that there are too many risks and not enough catalysts to get investors excited about Instacart[.]

97.     On this news, Instacart's stock price fell $2.73 per share, or 9.2%, from a closing price of $29.69 on September 29, 2023 to close at $26.96 per share on October 2, 2023.

## DAMAGES TO INSTACART

98.     As a direct and proximate result of the Individual Defendants' conduct, Instacart has lost and expended, and will continue to lose and expend, many millions of dollars.

99.     Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

100.    Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

101.    Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

102.    Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

103.    As a direct and proximate result of the Individual Defendants' conduct, Instacart has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

## DERIVATIVE ALLEGATIONS

104.    Plaintiff brings this action derivatively and for the benefit of Instacart to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Instacart, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, as well as for contribution under Section 11(f) of the Securities Act and Section 21D of the Exchange Act.

105.    Instacart is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

106.    Plaintiff is, and has been at all relevant times, a shareholder of Instacart. Plaintiff will adequately and fairly represent the interests of Instacart in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

107.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above, as though fully set forth herein.

108.    A pre-suit demand on the Board is futile and, therefore, excused. At the time of filing this action, the Board consists of the following nine individuals: Defendants Simo, Jordan, Levien, McCarthy, Moritz, Sarafan, Slootman, Sundheim, and Gupta (the "Director-Defendants"). Plaintiff needs only to allege demand futility as to five of the nine Director-Defendants who are on the Board at the time this action is commenced.

109.    Demand is excused as to all of the Director-Defendants because each of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts. This renders the Director-Defendants

unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

110.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted Instacart to make the materially false and misleading statements alleged herein. Specifically, the Director-Defendants knowingly or recklessly made material misrepresentations and/or omissions for the purpose and effect of concealing Instacart's financial well-being and prospects from the investing public and supporting the artificially inflated price of Instacart's securities. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, demand would be futile, and thus excused, as to all of the Director-Defendants, since they all breached their fiduciary duties, face a substantial likelihood of liability, and are not disinterested.

111.    Additional reasons that demand as to Defendant Simo is futile follow. Defendant Simo serves as the Company's CEO and Chairman of the Board. Defendant Simo has served as the Company's CEO since August 2021, as a Company director since January 2021, and as Chairman of the Board since August 2023. Thus, as the Company admits, she is a non-independent director. The Company provides Defendant Simo with her principal occupation for which she receives handsome compensation. As the Company's CEO, Defendant Simo was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in the Company's SEC filings refenced herein. As the Company's highest officer, she conducted little, if any, oversight of the scheme to make and/or cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Moreover, Defendant Simo is a defendant in the Securities Class Action. For

these reasons, too, Defendant Simo breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

112.    Additional reasons that demand as to Defendant Jordan is futile follow. Defendant Jordan has served as a Company director since June 2014. As a trusted Company director, he conducted little, if any, oversight of the scheme to make and/or cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Jordan is a defendant in the Securities Class Action. For these reasons, too, Defendant Jordan breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

113.    Additional reasons that demand as to Defendant Levien is futile follow. Defendant Levien has served as a Company director since October 2021.  Defendant Levien also serves as a member of the Audit Committee and as Chair of the Compensation Committee. As a trusted Company director, she conducted little, if any, oversight of the scheme to make and/or cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Moreover, Defendant Levien is a defendant in the Securities Class Action. For these reasons, too, Defendant Levien breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

114.    Additional reasons that demand as to Defendant McCarthy is futile follow. Defendant McCarthy has served as a Company director since January 2021. Defendant McCarthy also serves as Chair of the Audit Committee. As a trusted Company director, he conducted little, if any, oversight of the scheme to make and/or cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant McCarthy is a defendant in the Securities Class Action. For these reasons, too, Defendant McCarthy breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

115.    Additional reasons that demand as to Defendant Moritz is futile follow. Defendant Moritz has served as a Company director since June 2013. Defendant Moritz also serves as a member of the Audit Committee and as Chair of the Nominating and Corporate Governance Committee. As a trusted Company director, he conducted little, if any, oversight of the scheme to make and/or cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Moritz is named as a defendant in the Securities Class Action. For these reasons, too, Defendant Moritz breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

116.    Additional reasons that demand as to Defendant Sarafan is futile follow. Defendant Sarafan has served as a Company director since October 2021. Defendant Sarafan also serves as a member of the Compensation Committee and the Nominating and Corporate Governance Committee. As a trusted Company director, she conducted little, if any, oversight of the scheme to

make and/or cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Moreover, Defendant Sarafan is a defendant in the Securities Class Action. For these reasons, too, Defendant Sarafan breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

117.    Additional reasons that demand as to Defendant Slootman is futile follow. Defendant Slootman has served as a Company director since January 2021. As a trusted Company director, he conducted little, if any, oversight of the scheme to make and/or cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Slootman is a defendant in the Securities Class Action. For these reasons, too, Defendant Slootman breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

118.    Additional reasons that demand as to Defendant Sundheim is futile follow. Defendant Sundheim has served as a Company director since June 2020. Defendant Sundheim also serves as a member of the Compensation Committee. As a trusted Company director, he conducted little, if any, oversight of the scheme to make and/or cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Sundheim breached his fiduciary duties, faces

a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

119.    Additional reasons that demand as to Defendant Gupta is futile follow. Defendant Gupta has served as a Company director since September 2023. As a trusted Company director, he conducted little, if any, oversight of the scheme to make and/or cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Gupta breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

120.    Additional reasons that demand on the Board is futile follow.

121.    All of the Director-Defendants benefitted directly from the wrongdoing alleged herein, as the false and misleading statements caused the Company's stock price to be artificially inflated, thus increasing the value of Instacart stock held by the Director-Defendants.

122.    Defendants Levien, McCarthy, and Moritz (the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure

controls and procedures, and Code of Conduct. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

123.    In violation of the Code of Conduct, the Director-Defendants engaged in or permitted the scheme to cause the Company to issue materially false and misleading statements to the investing public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, and waste of corporate assets. In addition, the Individual Defendants violated the Code of Conduct by failing to act with integrity, failing to avoid conflicts of interest, failing to ensure the Company's disclosures were accurate, failing to ensure the Company complied with applicable laws, rules, and regulations, and failing to promptly report known violations of the Code of Conduct and the law. Thus, the Director-Defendants breached the Company's own Code of Conduct, are not disinterested, and demand is excused as to them.

124.    Instacart has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or any others who were responsible for the wrongful conduct to attempt to recover for Instacart any part of the damages Instacart suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

125.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable

of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

126.    The acts complained of herein constitute violations of fiduciary duties owed by Instacart's officers and directors, and these acts are incapable of ratification.

127.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Instacart. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Instacart, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

128.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Instacart to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

129.    Thus, for all the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least five of them, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

130.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

131.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Instacart's business and affairs.

132.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

133.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Instacart.

134.    In breach of their fiduciary duties owed to Instacart, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (i) the Company exaggerated the speed at which online grocery shopping and delivery habits among consumers were accelerating; (ii) the Company downplayed the extent of the competition Instacart faced in the online grocery shopping and delivery market; (iii) due to the foregoing, the Defendants overstated Instacart's post-IPO growth, business, and financial prospects; and (iv) as a result, Instacart's public statements were materially false and misleading at all relevant times.

135.    The Individual Defendants also failed to correct and/or caused the Company to fail to correct the false and misleading statements and omissions of material fact, thus rendering them personally liable to the Company for breaching their fiduciary duties.

136.    Also in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

137.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Instacart's securities, and disguising insider transactions.

138.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Instacart's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

139.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

140.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Instacart has sustained and continues to sustain significant damages.

141.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

142.    Plaintiff on behalf of Instacart has no adequate remedy at law.

### SECOND CLAIM

**Against Individual Defendants for Unjust Enrichment**

143.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

144.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Instacart.

145.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Instacart that was tied to the performance or artificially inflated valuation of Instacart, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

146.    Plaintiff, as a shareholder and representative of Instacart, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breaches of their fiduciary duties.

147.    Plaintiff on behalf of Instacart has no adequate remedy at law.

## THIRD CLAIM

### Against the Individual Defendants for Abuse of Control

148.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

149.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Instacart, for which they are legally responsible.

150.    As a direct and proximate result of the Individual Defendants' abuse of control, Instacart has sustained significant damages.  As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Instacart has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

151.    Plaintiff on behalf of Instacart has no adequate remedy at law.

## FOURTH CLAIM

### Against the Individual Defendants for Gross Mismanagement

152.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

153.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Instacart in a manner consistent with the operations of a publicly-held corporation.

154.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Instacart has sustained and will continue to sustain significant damages.

155.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

156.    Plaintiff on behalf of Instacart has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

157.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

158.    As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions (as evidenced, for example, by the Securities Class Action), to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

159.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

160.    Plaintiff, on behalf of Instacart, has no adequate remedy at law.

## SIXTH CLAIM

### Against the Class Action Defendants for Contribution Under Section 11(f) of the Securities Act and Section 21D of the Exchange Act

161.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

162.    As a result of the conduct and events alleged above, the Company is a defendant in the Securities Class Action brought on behalf of Instacart shareholders, in which it is a joint tortfeasor in claims brought under Sections 11 and 15 of the Securities Act.

163.    Federal law provides Instacart with a cause of action against other alleged joint tortfeasors under Section 11(f) of the Securities Act.

164.    The plaintiffs in the Securities Class Action allege that the Offering Documents contained untrue statements of material facts or omitted to state other facts necessary to make the statements made not misleading and omitted to state material facts required to be stated therein.

165.    Instacart is the registrant for the Offering. The Class Action Defendant were responsible for the contents and dissemination of the Offering Documents.

166.    As issuer of the shares, Instacart is strictly liable to the class action plaintiffs and the class for the misstatements and omissions.

167.    The plaintiffs in the Securities Class Action allege that none of the defendants named therein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents and other subsequent public filings were true and without omissions of any material facts and were not misleading.

168.    The Class Action Defendants, because of their positions of control and authority as controlling shareholders, officers, and/or directors of Instacart, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Instacart, including the wrongful acts complained of herein and in the Securities Class Action.

169.    Accordingly, the Class Action Defendants are liable under Section 11(f) of the Securities Act, 15 U.S.C. § 77k(f)(1), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Securities Act.

170.    As such, Instacart is entitled to receive all appropriate contribution or indemnification from the Class Action Defendants.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)     Declaring that Plaintiff may maintain this action on behalf of Instacart, and that Plaintiff is an adequate representative of the Company;

(b)     Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Instacart;

(c)     Determining and awarding to Instacart the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing Instacart and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Instacart and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of Instacart to nominate at least five candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding Instacart restitution from the Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including

reasonable attorneys' and experts' fees, costs, and expenses; and

(g) Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: March 4, 2024

Of Counsel:

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

**BRONSTEIN, GEWIRTZ & GROSSMAN, LLC**
Peretz Bronstein
Eitan Kimelman
60 East 42nd Street, Suite 4600
New York, NY 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
Email: peretz@bgandg.com
       eitank@bgandg.com

Respectfully submitted,

**FARNAN LLP**

/s/ Michael J. Farnan
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 N. Market St., 12th Floor
Wilmington, DE 19801
Telephone: (302) 777-0300
Facsimile: (302) 777-0301
Email: bfarnan@farnanlaw.com
Email: mfarnan@farnanlaw.com

*Attorneys for Plaintiff*